# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 7, 2008 Session

## STATE OF TENNESSEE v. MICHAEL A. VIRGA

**Appeal from the Circuit Court for Putnam County**
**No. 05-0629     Leon C. Burns, Jr., Judge**

---

**No. M2008-00209-CCA-R3-CD - Filed March 3, 2009**

---

The defendant, Michael Virga, was convicted of aggravated arson for burning down a trailer home where he resided. He was also convicted of first degree felony murder for the death of Rochelle Hinrich, who died in the fire. He challenges his convictions, arguing that the trial court should have granted his motion to suppress his confession to law enforcement officers because the statements were not given freely, voluntarily, and intelligently. He also challenges the sufficiency of the convicting evidence. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

H. Marshall Judd, Allison Roberts, and Edwin G. Sadler, Cookeville, Tennessee (at trial); and F. Chris Cawood, Kingston, Tennessee (on appeal), for the appellant, Michael Virga.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Randall A. York, District Attorney General; Anthony J. Craighead and Beth Willis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In the late night or early morning of August 7 and 8, 2005, firefighters responding to a fire at a trailer in a neighborhood on Shag Rag Road in Cookeville, Tennessee, discovered a female's body in the bedroom of the trailer. Agents from the Tennessee Bomb and Arson Section investigated the scene. During the investigation, the defendant and his roommate, Steve Tracey, who lived at the trailer with the victim, were present at the scene. The agents interviewed the defendant, who confessed to setting the trailer on fire.

On November 8, 2005, a Putnam County grand jury indicted the defendant on three counts. Count I alleged that the defendant "did unlawfully, intentionally and with premeditation kill

Rochelle Hinrich in violation of T.C.A. § 39-13-202," Count II alleged that the defendant killed the victim "during the perpetration of or attempt to perpetrate arson in violation of T.C.A. § 39-13-202," and Count III alleged that the defendant committed aggravated arson by "unlawfully and knowingly damag[ing] a structure with one person therein by means of a fire without the consent of all persons who had possessory, proprietary or security interest therein in violation of T.C.A. § 39-14-302." Prior to trial, the State dismissed the premeditated murder charge (Count I) and proceeded on the theories of aggravated arson and felony murder resulting from aggravated arson (Counts II and III).

*Suppression Hearing*

The defendant filed a pretrial motion to suppress arguing that his statements given to law enforcement agents were "unlawful because they were involuntary due to the severe intoxication of the defendant," because "[t]he defendant had not had any sleep and did not understand what was happening at the time he gave the statement," and because "[t]he statement was not written by the defendant and does not accurately reflect the oral statement given by the defendant." The statement at issue was given to Agents Scott Greenwood and Greg Whittaker of the Tennessee Bomb and Arson Section. The confession reads, in full,

> On 8-8-2005 at [approximately] 12:00 [a.m.] I Michael A. Virga was asleep on the couch at my [m]obile [h]ome. I woke-up, I had been very upset about my bills. I decided that I was going to set the [h]ouse on fire. I went outside and got the gas can that had [approximately] 1/4 gal[lons] of gas inside it. I then went back into the house trailer and poured gas along the front of the T.V. I then went over to the stove and got a 1/2 gallon of cooking oil and I poured the oil on the stove[,] the refrigerator[,] and microwave and counter-tops. I then went back over to the sink area and lit[] the oil. I then left and went over to where that I had poured the gas out and lit[] it. When I lit[] the gas it flashed up and my nose and hair caught on fire. I reached and grabbed the gas jug and threw it down as I was going out the front-door. I then ran around the [m]obile home and turned left and went to the back door. When I got to the back door I meet Steve, I ask him where Rochelle was, Steve said that he thought that she was still inside. I then went inside the back door and went into mine and Rochelle[']s bed-room and felt around on the bed trying to see if I could find Rochelle, I couldn't find her. I was having trouble bre[a]thing, I [was] also having trouble seeing. I finally got outside the bedroom door as I was leaving I burned my arm as I [] went [through] the door-way. I got outside and stood away from the fire and watched it burn. I was very upset and a police officer had to physically restrained [sic]. This all being due to the fact that I knew I had set the [m]obile home on fire.

Steve Tracey had no knowledge of the arson. I just woke up and decided that if I could get rid of the [m]obile home that me and [Rochelle] would not have no more worr[ie]s and we would not be[] fighting anymore. I Michael A. Virga didn't [plan] this fire, I just woke-up from the couch and decided to do it.

I give this statement of my own free will, no promises or threats have been made. I fully understand my Miranda Rights.

The statement was signed by the defendant. The document indicated that it was "taken by" Agent Whittaker and "witness[ed]" by Agent Greenwood.

The trial court held a hearing on the motion to suppress, and defense counsel argued that "the court should consider that [the defendant] had been severely intoxicated the night before, that he had been sleep deprived and did not understand when he gave the statement that . . . the written statement did not reflect his oral statement given to the officers."

The State called Agent Scott Greenwood of the Tennessee Bomb and Arson Section. Agent Greenwood testified that he had been assigned to investigate the trailer fire and the death of the victim. He reported to the scene at approximately 2:00 a.m. on August 8, 2005, but, when he first arrived, the defendant was being treated for burn wounds at the hospital. He testified that on the "morning" of August 8, the defendant returned to the scene; however, Agent Greenwood did not speak with him during this time. At some point, the defendant left the scene with Mr. Tracey, his roommate, and he returned about 30 minutes to an hour later with a 12-pack of beer. Agent Greenwood instructed law enforcement personnel to prevent the defendant from consuming any of the beer because he wanted to speak with him later. Agent Greenwood testified that he then spoke with the defendant at the scene. He stood two or three feet from the defendant, who did not appear intoxicated.

The defendant was later transported to the Putnam County Sheriff's Department for further questioning about the suspected arson. Agent Greenwood testified that, to his understanding, Agent Whittaker had administered the defendant his *Miranda* warnings. He said, "We actually have a sheet that lists them all out," and the defendant signed the sheet. He described the protocol that he followed during the interview, "We'll talk to them, get a statement from them, take notes from that and then write out the statement, read the statement back to them, make sure that that is . . . their word and then have them sign the bottom of the sheet." According to Agent Greenwood, at no time during the interview did the defendant object to the accuracy of the written statement. He testified that the defendant signed and dated the statement at 6:45 p.m., August 8, 2005. Agent Greenwood also drew a diagram of the trailer and "had [the defendant] point out on the diagram . . . where he did everything and what order he did it in and then . . . had him sign off on it." Agent Greenwood testified that the defendant did not appear sleep-deprived or intoxicated during the interview.

On cross-examination, Agent Greenwood acknowledged that he was not aware that, when the defendant was admitted to the hospital earlier that morning, he had a .16 blood alcohol content.[1] He testified that the defendant had "a burn on his nose and a burn on one of his arms." Agent Greenwood stated that the defendant did not complain and did not appear to be suffering from any pain during the interview. He also noted that the defendant seemed fairly calm during the interview.

Agent Whittaker's testimony was substantially similar to that of Agent Greenwood. Agent Whittaker interviewed the defendant immediately before he confessed. He said, "[T]he defendant started out by saying he had nothing to do with it, then he became emotional, started crying and said he did it." He testified that the defendant did not appear "too intoxicated" or "too sleep deprived" to "know what he was doing." Agent Whittaker hand-wrote the defendant's statement and, along with Agent Greenwood, reviewed the accuracy of the statement with the defendant.

On cross-examination, Agent Whittaker noted that the defendant never fell asleep during the course of the interview. The defendant only complained that he needed an inhaler, and Agent Whittaker attempted to arrange for an inhaler. He admitted that no video or audio recordings existed of the interview.

The defendant testified in the suppression hearing that, after the fire, he was taken to the hospital for "[s]moke inhalation and . . . second degree burns on [his] arm and on [his] face and [his] nose and [his] cheek" but that he refused any medication from the hospital. He was released from the hospital at approximately 6:05 a.m. He then returned to the scene of the fire. He testified that he and his roommate, Mr. Tracey, left the scene for approximately one and a half to two hours. During this time, the defendant testified that he purchased alcohol. He purchased a 40-ounce beer to "slam down" to "calm [his] nerves," then returned to the scene.

The defendant testified that he had been drinking alcohol "[a]ll day" on August 7 prior to the fire. He said, "I started drinking around 9:30 or 10:00 that morning, so I was pretty drunk."

The defendant estimated that he was taken to the Sheriff's Department at 1:30 or 2:00 p.m. on August 8. He testified that he did not remember much of his interview with law enforcement officers. He said, "I don't remember really too much of anything from that night until the next morning when I woke up or afternoon. I didn't have no sleep for almost thirty six hours." On cross-examination, he clarified that he had slept from 12:00 or 1:00 a.m. until 6:30 or 7:00 a.m. on August 7, and he briefly slept from approximately 10:30 p.m. the night of August 7 until the fire woke him around 12:00 a.m. on August 8. The defendant testified that he only remembered discussing a gas can during the interview. When asked why he could not remember, he responded, "It was very little

_____

[1] Although defense counsel asked this question, he never presented any evidence during the motion hearing to establish that the defendant, in fact, had a .16 blood alcohol concentration at the hospital.

sleep, I mean . . . I slept with my girlfriend nine years and everything. And I walked out with a pair of shorts. I tried to go back and get her, I mean . . . being burned I in my mind was just kind of stuck somewhere else." He said that, during the interview with the agents, "[he] wasn't intoxicated, trashed intoxicated. But . . . [he] slammed that forty [ounce beer] pretty quick."

On cross-examination, the defendant stated that he had not met or encountered Agents Greenwood and Whittaker prior to August 8. He explained that he worked as a painter and, on August 7, the day leading to the fire, he had "a job" at 7:45 a.m. He stated that he would drink during his jobs. He testified, "I usually brought a couple of beers with me and leave [the victim] some. We'd usually leave around 11:00, 11:30, I'd bring up another twelve-pack and bring it to her, sit there and have another couple of beers." He described himself as a "heavy drinker" of 14 years. The defendant explained that he could drink "a couple of beers and . . . have a buzz and hide it, not be staggering around and slurring [his] words, but still be buzzed." He could drink a six-pack of beer and perform his job as a painter.

The defendant stated that he did not eat breakfast or lunch on August 7, and he only "nibbled" at dinner. He said, "We went home around 11:00[a.m.], brought our beer, I started drinking more . . . , we went back to the job, . . . we sat there for about an hour drinking more beer, packing our tools up. I didn't even go back, I didn't even work after that, I just went in and packed up my tools and left [be]cause I had too much of a buzz." He testified that he fell asleep on the couch around 11:00 p.m. He maintained that he did not set the fire.

The defendant rode in a law enforcement vehicle to the Sheriff's Department for questioning. He stated that he did not feel he was "free to leave," and he explained, "[W]hen I first got there I asked if I could go out and have a cigarette, they wouldn't let me go out unless somebody went with me. I couldn't go to the bathroom unless one of the detectives went with me." The defendant testified that, although he had not been formally charged with any crime, he thought he was under arrest at the time of the interview.

When confronted with the written statement of his confession, the defendant said, "It's a statement but I'm not saying that's what I said." He acknowledged that he signed the statement and the diagram of the trailer. The defendant testified that he was basically "blacked out" when he gave his statement to the agents. He only remembered mentioning about a gas can because "[he] had a gas can sitting out by the trailer, with no gas in it usually. [Because] Steve used it, too. There was an RV the owner of the, the landlord had, and Steve had a tendency of running over there and ciphoning [sic] gas out of it."

At the close of the hearing, defense counsel argued, "The entire facts taken together . . . indicates under the law that the statement that he gave was not voluntary and should be suppressed." The trial court noted that "factors that the court is to consider [are] the characteristics of the defendant, his age, intelligence, mental condition, physical condition, criminal experience, background, the length of interrogation . . . . And the court in this case has looked at and considered all these factors." The trial court credited the agents' testimony about the defendant's sobriety and

demeanor and noted that the statement at issue was "very detailed . . . about what happened." The trial court also found the defendant's testimony not credible, and it denied the defendant's motion to suppress. In a written order, the trial court found that "defendant's statement given to the investigators on August 7, 2005[,] was given knowingly, voluntarily, and intelligently, and is therefore admissible."

*Trial*

At trial, the State first called Beulah Jean Thompson, the victim's mother. She testified that the victim was 32 years old at the time of her death. She stated that the victim had dated the defendant for nine years, and they had lived at trailer "number C" at Shag Rag Road for four or five months before the victim's death. She last spoke with the victim at 9:58 p.m. on August 7, 2005. She testified, "I was supposed to go over and pick [the victim] up the next day after work, at 11:00, to take her over to my place, because she was leaving [the defendant]." However, she received notice that her daughter had died at 2:00 a.m. that morning.

Kenneth Winningham was a neighbor of the defendant and the victim. He testified that he was in his bedroom with a toothache when he "[saw] this big flash and hear[d] a big racket." He stuck his head out his window and saw the trailer on fire. He said, "On the front side of it, it was really blazing really bad," describing the living room area of the trailer. Mr. Winningham then ran outside toward the burning trailer. He saw the defendant in the back yard, and he saw Mr. Tracey across the road on "a little graveled road that goes into the trailer park." Mr. Winningham "asked [the defendant] where [the victim] was at, and he said his baby was gone. But the fire was blazing so high, . . . if she was up in that part of the house, she was gone."

Mr. Winningham then ran to the front yard of the trailer, and when he returned, Mr. Winningham's roommate, Anthony Moon, was speaking with the defendant. Mr. Winningham testified that the defendant said to Mr. Moon, "Why did I do it?" Mr. Winningham did not see the defendant attempt to run back into the trailer, although he asked the defendant about saving the victim several times. After the fire department arrived, he did not see the defendant again that evening, but he thought "the arresting officers took [the defendant] out of there."

The following morning, the defendant stopped by Mr. Winningham's trailer and asked to leave a bag of clothes at his trailer. Mr. Winningham testified that the defendant's demeanor was "[j]ust calm." He testified, "[The defendant] said that, if a shorted wire or something or another, burned the trailer, he was going to sue the trailer park, or something or another, like in that coloration."

On cross-examination, Mr. Winningham stated that he was not on any medication for his toothache that evening and that he had not been drinking alcohol. He clarified that he stayed at the scene of the fire until the fire department arrived.

Michael Keith testified that he had worked as a firefighter for 22 years, and he was employed with the Murfreesboro Fire Department and volunteered with the Putnam County Fire Department. When he first got to the scene at Shag Rag Road, he saw a single-wide mobile home, "approximately three-quarters involved in fire, with fire coming from the remainder of the other quarter, which was pretty much involved also." Mr. Keith described the trailer as "free burning" -- the "worst" stage of a fire. From the outside of the trailer, he could see the victim's body in what he assumed was a bedroom. The victim's body was found "where the least amount of fire was." He encountered the defendant at the scene, who informed him that his girlfriend was in the trailer. On cross-examination, Mr. Keith stated that the defendant had to be restrained by Sheriff's deputies to prevent him from running back into the trailer.

William Smith testified that he owned the trailer at Shag Rag Road that burned down in August 2005. He owned the trailer park, which was named "Woodland Trailer Park." He testified that the victim had rented the trailer from him on April 2, 2005, and that she paid rent for the trailer. Mr. Smith testified that he did not give the defendant, nor anyone else, permission to burn his trailer on Shag Rag Road.

Scott Greenwood testified at the trial. By the trial date, Agent Greenwood had left the Tennessee Bomb and Arson Section and joined CSX Transportation as a railroad detective. Agent Greenwood's testimony consisted largely of the same testimony given at the suppression hearing.

Agent Greenwood also testified about his examination of the crime scene after the fire had been put out. He found the victim lying on the floor. He said, "I believe her head was at about the foot of the bed . . . or next to the bed, and her feet were towards the head of the bed. . . . [The body] was burned pretty badly. You . . . could still tell it was a body, but a lot of hair was burned off. It was in pretty bad condition." Agent Greenwood observed "pour pattern[s]" both on the trailer's living room floor and the kitchen cabinets. He examined the residence for any accidental causes of fire, such as electrical wiring, however "[a]ll of the fire patterns led [him] right back into the floor." Agent Greenwood found holes burned through the floor, which indicated that a liquid accelerant had been poured and ignited in the area. He also observed a "rainbow" in a puddle of water on the burnt floor, which also indicated the use of an accelerant. He took a sample from the floor to send to the Tennessee Bureau of Investigation ("TBI") crime laboratory for analysis. In the kitchen, he found evidence that cooking oil had been poured as an accelerant. Agent Greenwood also found an empty gas can outside the trailer's front door, and he testified that the defendant indicated that he used that gas can to start the fire. He testified that he called Special Agent Robert Watson from Knoxville to examine the scene with his trained dog.

Agent Greenwood testified that he went to the Sheriff's Department after his investigation of the scene. He interviewed Mr. Tracey for approximately four hours, then Agent Whittaker interrupted this interview to inform him that the defendant had confessed. Agent Greenwood testified that the defendant said that he was upset with his financial situation and burned down the trailer. The defendant said that he "was sitting on the couch and took a lighter, leaned over

in the floor and struck the lighter, and when he did, the flames flashed up on him and burned his arm and burned him on the nose." Agent Greenwood posited that the defendant's confession was consistent with the burn patterns that he observed.

On cross-examination, Agent Greenwood stated that he was aware that the defendant had stated to another agent that he did not start the fire. He described the defendant's demeanor during the interview as "just kind of . . . he seemed calm. He didn't . . . seem real upset about . . . what he was telling me." He admitted that he was aware that the defendant had been awake for "quite a period of time" but maintained that the defendant never indicated that he was tired. He also stated that he was aware that the defendant worked as a painter and kept paint thinner -- which can be used as an accelerant -- in the trailer.

Agent Whittaker also testified to facts substantially similar to those he presented during the suppression hearing. He explained that he was assigned to assist Agent Greenwood with the investigation and that he was speaking with the defendant when he confessed. He said, "Basically we sat down and started talking about the fire, and [the defendant] broke down and started explaining that he had set the fire." He stated that the defendant "became emotional." Agent Whittaker had spoken with the defendant for five to ten minutes when he "broke down," and, at that point, Agent Whittaker stopped the defendant and found Agent Greenwood. The State introduced the defendant's written statement into evidence through Agent Whittaker's testimony and presented it to the jury.

Agent Robert Watson of the Bomb and Arson Section testified that he was a certified fire investigator and handler of a hydrocarbon-detection dog. He testified that he had been with his dog since 2000, and he had taken her to "hundreds" of fire scenes. He "works" his dog 365 days a year, and he said, "There are 2730 some odd distractors that she had been checked off on." Agent Watson testified that he arrived at the scene per Agent Greenwood's request. His dog "alerted in two different areas, indicating . . . that there was an ignitable liquid in the floor area." He cut samples from the floor where the dog alerted for later analysis by the TBI. On cross-examination, Agent Watson clarified that his dog was not trained to alert on "accelerants," but she was trained to alert on "hydrocarbon," which is a component of an ignitable and/or combustible liquid.

Agent Randall Kirk Nelson of the microanalysis unit of the TBI crime laboratory analyzed the fire debris to identify the presence of any ignitable liquids. He stated that the sample provided by Agent Greenwood "revealed the presence of turpenes, which are present in turpentine and occur naturally in some wood products." However, he found that the samples from Agent Watson "revealed the presence of an evaporating gasoline-range product. Products in this range include all brands and grades of automotive fuels, including gasohol." He explained that this "evaporating gasoline-range product" could not be paint thinner, because, although an accelerant, paint thinner is a wholly different classification.

Doctor Amy R. McMaster testified that she was an employee of Forensic Medical, the company hired to perform the autopsy on the victim. Doctor Wayne Kurz, a training physician,

performed the autopsy under Doctor McMaster's supervision. She stated, "The cause of death is officially listed as smoke inhalation and thermal injuries." She testified that Doctor Kurz "estimated . . . about 90 percent of [the victim's] total body surface area was burned." The victim had "[f]ull thickness burns" that were located "down the entire depth of the skin and sometimes even deeper." Doctor McMaster testified that "soot" was found in the victim's airway, "which is evidence of smoke inhalation." She explained that the victim "was alive and breathing at the time the fire was going." A test of the victim's blood showed a 94 percent carbon monoxide level. Doctor McMaster testified that the average healthy adult maintains a carbon monoxide level of less than five percent and that the victim's elevated carbon monoxide level indicated significant soot or smoke inhalation.

Doctor McMaster also testified that the victim had a .28 percent blood alcohol concentration. The victim also had tetrahydrocannabinol (THC) and carboxy THC in her blood. Other drugs in the victim's system included promethazine (used for nausea, vomiting, and as a sedative), olanzapine (used as an antipsychotic drug for bipolar and schizophrenia), and noratriptyline, a metabolite of amitriptyline (used as an antidepressant). She stated that these drugs did not contribute to the victim's death. On cross-examination, she stated that all of the legal drugs found in the victim's blood, except the olanzapine, were "within the therapeutic range."

The sole defense witness was Sandra Garza, who lived at trailer "J" in the trailer park. She testified that, on the night of the fire, she "had been out kind of late." She stated, "When I got back in, ten, or maybe even less than ten minutes, [the defendant] came to my door and knocked on it. I didn't want to open because it was late, and it scared me, because he knocked really hard on the door. And I asked who it was, and he said, 'It's your neighbor.' . . . I went ahead and opened the door." She stated that the defendant's "hair . . . was kind of wild, and he was dirty." The defendant asked her for a fire extinguisher, but she did not have one. Ms. Garza testified that the defendant was "really desperate" and that "he left running." She "looked at his trailer, and [she] saw that flames were coming out of the door and window." She testified that the defendant ran toward the front of the burning trailer. Ms. Garza stated that "all" of the neighbors were outside. Before the fire department arrived, she saw the defendant "was trying to get back in, and he was shouting . . . his wife was inside" while the neighbors held him back. Ms. Garza testified that the police never approached her to speak about the events of that night.

Based on the evidence as summarized above, the jury convicted the defendant of aggravated arson and first degree felony murder. The trial court entered judgments on the convictions on April 12, 2007, sentencing the defendant to a term of life imprisonment for the murder conviction and a term of 20 years' imprisonment for the aggravated arson conviction.[2] The trial court ordered the sentences to run concurrently. The defendant filed a motion for new trial on April 17, 2007, and amended his motion on November 29, 2007. The trial court entered an order denying the motion on December 7, 2007. The defendant then filed his notice of appeal on January 16, 2008.

---

[2]The jury also levied a $50,000 fine on the defendant for the aggravated arson conviction.

Before we determine the merits of the case, we must determine whether to hear the defendant's untimely appeal. The defendant's notice of appeal was not filed until January 16, 2008, and, accordingly, was untimely. *See* Tenn. R. App. P. 4(c). Even so, Appellate Rule 4(a) provides in pertinent part, "[H]owever, in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). The notice in this case was untimely by ten days. However, in light of the magnitude of the convictions in this case, we have reviewed the issues raised on appeal and find them to be well presented and clearly stated. All things considered, we believe that the interest of justice will be better served by waiving the timely filing of a notice of appeal, and we now proceed to the merits of the defendant's appeal.

*Suppression of the Defendant's Statements*

The defendant appeals from the trial court's denial of his motion to suppress, stating that law enforcement officers "took advantage of an emotionally weakened, sleep-deprived person who had been drinking alcohol to a large extent and had been treated and released at a local hospital." The defendant maintains that he "was in no shape to make a free, voluntary, and intelligent statement" and that the trial court did not look "at the totality of the circumstances" in ruling on the defendant's motion.

At an evidentiary hearing, the state has the burden of demonstrating by a preponderance of the evidence that the defendant's statements were voluntary, knowing, and intelligent. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). A trial court's determination at a suppression hearing is presumptively correct on appeal, *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994), and the findings are binding upon this court unless the evidence contained in the record preponderates against them, *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996); *Stephenson*, 878 S.W.2d at 544; *State v. Aucoin*, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988).

Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court. *Odom*, 928 S.W.2d at 23. Thus, on appeal, the defendant has the burden of showing that the evidence preponderates against a finding that a confession was, in fact, knowingly and voluntarily given. *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984). In determining whether a statement is made voluntarily, this court must look to the totality of the circumstances surrounding the confession, and the standard is whether "'the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *Kelly*, 603 S.W.2d at 728 (quoting *Rogers v. Richmond*, 365 U.S. 534, 81 S. Ct. 735 (1961)).

A statement will be excluded "only if an examination of the totality of the circumstances reveals that the statement was not voluntarily given." *State v. Huddleston*, 924 S.W.2d 666, 670 (Tenn. 1996). The circumstances to be examined include:

> "[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse."

*Id.* at 671 (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)). "[T]he focus on unnecessary delay should not be solely on the length of the delay, but rather on the circumstances of the delay and their effect on the accused." *Id.* The length of the delay is nevertheless a significant factor in determining the voluntariness of a confession. *Id.*

On appeal, the defendant stresses that he was held at the Sheriff's Department for four hours prior to his interview and that he was then interviewed for two hours. In addition to the length of his detention, the defendant posits that the trial court failed to consider the "emotional strain" of "losing his companion of nine years," his "alcoholism," and his drinking and smoking marijuana leading up to the fire. A review of the record reveals that the trial court adequately reviewed all relevant factors in denying the defendant's motion, and we will not disturb the trial court's ruling.

The trial court chose to credit the testimony of Agents Greenwood and Whittaker, who testified that the defendant at no time appeared too sleep-deprived or too intoxicated to speak with law enforcement. According to the defendant's own admission, the only alcohol that he consumed on August 8 was a "forty" of beer, which he drank more than four hours before his confession. Considering this in the light of the defendant's testimony that he regularly functioned after drinking a six-pack of beer, the trial court acted within its discretion in finding that the defendant was not too intoxicated to make a voluntary statement to the police. Further, "intoxication does not render a confession invalid if the evidence shows that the defendant was capable of understanding and waiving his rights." *State v. James David Johnson*, No. W2006-01842-CCA-CD, slip op. at 5 (Tenn. Crim. App., Jackson, Feb. 6, 2008) (citing *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)). The defendant also testified that he had a regular night's sleep on the night preceding the fire and that he slept for more than an hour on the night of the fire. Although not an ideal amount of sleep, nothing in the agents' testimony or the nature of the detailed statement given by the defendant suggests that he was so sleep-deprived that he could not make a voluntary statement. The defendant never complained to the agents of being tired while at the Sheriff's Department, and he never dozed off or napped while he was with law enforcement officers.

Although the defendant waited four hours until he was interviewed, nothing in the record suggests that this was a tactic by law enforcement officers to "take advantage" of the

defendant. According to Agent Greenwood's testimony, he first spoke with the defendant's roommate, Mr. Tracey, for approximately four hours. Mr. Tracey and the defendant were the only surviving residents of the trailer fire that was the subject of an arson investigation. The agents acted within their purview in interviewing the men separately, although this meant that the defendant had to wait for some time at the Sheriff's Department. No testimony elicited during the motion hearing or the trial suggested that Agent Greenwood or Whittaker intentionally delayed the defendant's interview to elicit an involuntary statement from the defendant.

The defendant signed a waiver of his *Miranda* rights and gave the agents the detailed statement at issue. According to the agents' testimony, which was credited by the trial court, the defendant understood what he was doing, and he did not object to any portion of the statement as transcribed by Agent Whittaker. We cannot say that the evidence preponderates against the trial court's ruling, and we affirm the trial court.

We note that the defendant also appeals the trial court's denial of his suppression motion on the ground that the written statement is "inaccurate." The accuracy of a statement is not a ground on which to make a motion to suppress. Such an issue speaks to the weight of the evidence, and, as explained above, we will not re-weigh or re-evaluate the evidence presented before the trial court. *See Odom*, 928 S.W.2d at 23.

*Sufficiency of the Evidence*

The defendant challenges both of his convictions by arguing that the convicting evidence was insufficient as a matter of law. A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict because a guilty verdict destroys the presumption of innocence and replaces it with a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court must reject a defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Issues of the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. This court may not substitute its own inferences drawn from

circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.

Tennessee Code Annotated section 39-14-301 provides in relevant part that a person commits arson by "knowingly damag[ing] any structure by means of a fire or explosion . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein." T.C.A. § 39-14-301(a)(1) (2003). "A person commits aggravated arson who commits arson . . . [w]hen one (1) or more persons are present therein." T.C.A. § 39-14-302(a)(1).

The defendant argues that "[e]xcept for the statement of the [defendant] . . . , the evidence was consistent with the fire being an accidental one." We disagree. In addition to the defendant's confession in which he described how and why he started the fire, the jury was presented with Agent Greenwood's testimony that the "pour patterns" corroborated the defendant's confession. He found a large pour pattern on the living room floor and evidence of an accelerant on the kitchen counter tops. He also found an empty gasoline container outside the front door of the trailer. The TBI analysis showed the presence of "an evaporating gasoline-range product" from samples taken from the trailer's floor and that this accelerant could not be paint thinner. Other witnesses testified to seeing the defendant around the trailer at the time of the fire. Mr. Winningham testified that he heard the defendant say, "Why did I do it?"

The confession and other evidence provided ample support for the jury's finding that the defendant knowingly started the fire in the trailer. Mr. Smith testified that he, not the defendant, owned the trailer and that he did not give anyone permission to burn the trailer. The evidence clearly showed that, at the time the fire started, the victim was present in the structure. Such evidence satisfied all the required elements for aggravated arson.

The defendant further challenges his first degree murder conviction on sufficiency grounds. Tennessee Code Annotated section 39-13-202 provides that "[f]irst degree murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any . . . arson." T.C.A. § 39-13-202(a)(2). The killing may precede, coincide with, or follow the predicate felony and still be considered as occurring "in the perpetration of" the felony offense, so long as there was a connection in time, place, and continuity of action. *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999).

As we previously noted, the jury acted within its province in convicting the defendant of aggravated arson, which is the predicate offense to his felonious first degree murder conviction. The victim's body was found inside the burning trailer by the fire department. As Doctor McMaster testified, the victim died as a result of smoke inhalation and burns from the fire. Thus, clearly the jury could conclude that the death of the victim occurred "in the perpetration of" the aggravated arson. We will not disturb the jury's findings.

*Conclusion*

In light of the foregoing analyses, we affirm the convictions.

                                       _____

                                       JAMES CURWOOD WITT, JR., JUDGE